**Minnie KRANTMAN**

v.

**LIBERTY LOAN CORPORATION et al.**

**No. 54 C 1537.**

United States District Court
N. D. Illinois, E. D.

Sept. 4, 1956.

Askow & Stevens, Chicago, Ill., for plaintiff.

Andrew J. Dallstream, Fredric H. Stafford, Dallstream, Schiff, Hardin, Waite & Dorschel, Chicago, Ill., for defendants D. J. Harris and David S. Nerad.

Thomas C. Strachan, Jr. and Walter I. Deffenbaugh, Chicago, Ill., for defendant I. H. Levy.

Martin J. McNally and Nash, Ahern & McNally, Chicago, Ill., for defendants David B. Lichtenstein and Lyle S. Woodcock.

John F. Cashen, Jr., Chicago, Ill., for defendant Liberty Loan Corp.

PERRY, District Judge.

This action having been tried by the Court without a jury, and the Court having sustained the motion of the defendants to dismiss upon the merits after plaintiff completed the presentation of her evidence,

The Court does hereby make the following Findings of Fact and does hereby state the following Conclusions of Law:

### Findings of Fact.

1. Minnie Krantman, plaintiff, is a resident and a citizen of the State of Iowa. Defendants I. H. Levy and D. J. Harris and David S. Nerad are residents and citizens of the State of Illinois. Defendants David B. Lichtenstein and Lyle S. Woodcock are residents and citizens of the State of Missouri. Defendant Liberty Loan Corporation is a Delaware corporation and a citizen of that State. The amount in controversy for which plaintiff sues derivatively in the right of and for the benefit of the defendant Liberty Loan Corporation and the aggregate amount in controversy for which plaintiff sues as a representative of all former Class A common stockholders of said corporation each exceeds, exclusive of interest and costs, the sum of $3,000. There was no collusion between the plaintiff and any of the defendants to confer jurisdiction on this Court of this action.

2. Minnie Krantman, the plaintiff herein, through her attorney, Louis Shulman, placed an order with a broker to purchase 25 shares of Class A common

stock of Liberty Loan Corporation (hereinafter called "Liberty") on September 16, 1954. On October 18, 1954 Liberty issued its certificate for said shares in the name of plaintiff. On October 20, 1954 plaintiff filed her Complaint herein; a Supplemental Complaint was filed November 17, 1954; and an Amendment to Complaint and Supplemental Complaint was filed September 12, 1955.

3. Liberty was organized under the laws of Delaware in 1932 and has since been engaged in the small loan business. From then to and including November 3, 1954, it had outstanding both Class A common stock and Class B common stock, and also from time to time preferred stocks which were convertible into shares of Class A common stock. On November 3, 1954, there were outstanding 537,617 shares of Class A common stock held by about 4,000 widely scattered investors and 7,500 shares of Class B common stock, of which 7,241 shares (being approximately 97%) were owned by Key Finance Company.

4. Prior to November 3, 1954, the charter of Liberty provided that after the payment of or provision for full dividends on outstanding preferred stock, any dividends declared and paid on the Class A common stock and the Class B common stock should be declared and paid share and share alike. Also prior to November 3, 1954, the charter provided that upon liquidation after payment of or provision for the amounts due on the outstanding preferred stock the holders of the Class A common stock and of the Class B common stock were entitled share and share alike to all the remaining assets of the corporation. The charter further provided that no holder of any shares of capital stock should have any pre-emptive right but that any unissued stock of any class might be issued and disposed of by the board of directors to such persons, firms, corporations or associations and upon such terms as may be deemed advisable by the board of directors in the exercise of its discretion, subject to restrictions and limitations not material here.

5. Prior to November 3, 1954, the charter of Liberty further provided that the management of all of the affairs, property and interests of the corporation was vested in a board of directors to be elected annually; that the holders of the Class A common stock voting as a class were entitled to elect a maximum minority of the total number of directors to be elected in any year and that the holders of the Class B common stock voting as a class were entitled to elect a minimum majority of said total number of directors; that upon a default equal to four quarterly dividends on preferred stock, the holders of the preferred stock voting as a class should have the exclusive right to elect a maximum minority of the total number of directors but that the holders of the Class B stock would be entitled to continue to elect a minimum majority of such directors; and that as to any and all matters other than the election of directors, the voting power was vested solely and exclusively in the holders of the Class B common stock except as the General Corporation Law of Delaware and the charter otherwise require. Such requirements are not material to the issues in this action.

6. Originally, the Class B common stock of Liberty was issued to and held by Central States Finance Company, a corporation, of which I. H. Levy and his family group held the controlling stock. Upon the liquidation of Central States in 1939 or 1940, the Class B shares were distributed to its stockholders and since that time to and including July 19, 1954, I. H. Levy and his wife held more than one-half of such stock and through such ownership controlled Liberty.

7. On several occasions prior to July, 1954, I. H. Levy had negotiations with various companies concerning the disposition by him and members of his family of their Class B shares in Liberty. In 1951 Family Finance Corporation was willing to pay $1,800,000 for the shares of Class B stock. In the latter part of 1950 and the early part of 1951 American Investment Company was willing to pay $1,700,000 for said shares of Class B

stock. In 1953 American Investment Company again wished to purchase said Class B shares and offered $1,500,000, which amount was not acceptable to said I. H. Levy. Commencing in March, 1954, negotiations were had between I. H. Levy and certain directors of Liberty with representatives of Seaboard Finance Company, looking toward an exchange of stock of the two corporations under which the Class B shares of Liberty would be exchanged for 60,000 shares of a preferred stock of Seaboard, convertible on a share for share basis into Seaboard common stock within one year. Based upon the then market value of the Seaboard common stock, this would have produced something over $1,500,000 for the holders of the Class B common stock of Liberty but without any income tax being payable on the transaction by the holders of the Class B common stock. These negotiations and offers tended to establish a market price for the Class B common stock in the range from $1,500,000 to $1,800,000.

8. I. H. Levy, the chief executive officer of Liberty, in 1954 was reaching an advanced age. He was concerned about attracting and retaining excellent management for Liberty. The chief impediment to attracting such top flight management was the control feature of the Class B common stock, which, by its very nature, rendered the tenure of any such management insecure, being dependent entirely upon the actions of the owners of the majority of said stock.

9. In 1954 Lichtenstein was the Executive Vice President of American Investment Company, which was then the third largest company in the small loan industry. He was generally regarded as being one of the top executives in that field.

10. In February, 1954, Lichtenstein was granted a leave of absence from American Investment Company. Shortly thereafter, I. H. Levy met with Lichtenstein to discuss with him the possibility of Lichtenstein coming with Liberty There were several such meetings down to May 26, 1954, during which the situation was explored generally but during which Lichtenstein consistently maintained that he was not in a position to discuss any proposition so long as he remained in the employ of American Investment Company.

11. On May 24, 1954, Lichtenstein ceased to be Executive Vice President of American Investment Company. On May 26, 1954, and May 27, 1954, he had meetings with I. H. Levy and others, including Allen E. Nix and defendant Harris, two of the three Liberty directors representing the Class A shareholders. During the course of these meetings Lichtenstein's coming with Liberty was discussed, along with the possibility of a purchase by him of one-half of the Levy family holdings of Class B common stock. Such a purchase was determined to be unacceptable to either party because the balance of control would be left in the small number of shares not owned by either I. H. Levy or members of his family or by Lichtenstein. I. H. Levy then decided that he would not sell less than all of his holdings of Class B common stock.

12. Subsequently a group of investors, mostly from St. Louis, Missouri, was formed, and the purchase of 7,241 shares of Class B common stock of Liberty owned by I. H. Levy and members of his family for the price of $1,700,000, $881,000 payable in cash and the balance evidenced by notes fully collateralized, was negotiated on behalf of such group by Lichtenstein with Levy. These negotiations were carried on and the subsequent purchase was consummated at arms' length and not as a part of any scheme between Lichtenstein and I. H. Levy, as charged in the Complaint or otherwise.

13. Key Finance Company, a Missouri corporation, was incorporated on or about July 2, 1954. Its stockholders were the above mentioned group of investors. An aggregate of 47% of the stock of Key Finance Company was owned originally and at the time of trial by two sons and the wife of Lichtenstein, 9.7% of such stock was owned by William

A. Gerard, 9.7% by defendant Lyle S. Woodcock, and 5.5% by Anthony A. Buford (the last three being directors of Liberty who were elected to such directorships on July 20, 1954). Full information as to this stock ownership was contained in the proxy statement of September 21, 1954. Lichtenstein has never been a stockholder, director or officer of Key Finance Company, nor has any of the other defendants except Woodcock, who was and is a stockholder.

14. On July 8, 1954, options to purchase an aggregate of 7,241 shares of Class B common stock were granted to said Key Finance Company by I. H. Levy and his wife, Louis Strilky (his brother-in-law), Harriet Levy (his daughter), and H. H. Levy (his brother) and members of the latter's family. These options related only to an outright purchase, without any contingency, condition or limitation, from I. H. Levy and the other grantors of said options of the 7,241 shares of Class B common stock of Liberty, for the aggregate price of $1,700,000. On July 19, 1954, Key Finance Company exercised said options and purchased unconditionally and became the owner of said 7,241 shares of Class B common stock without any commitment or agreement by anyone that the Class B common stock would be reclassified or exchanged for any other stock of Liberty.

15. On July 20, 1954, at a special meeting of the board of directors of Liberty four members of the then existing board, Louis Strilky, H. H. Levy, F. S. Diebler, and defendant D. S. Nerad, resigned and William A. Gerard, Anthony A. Buford, and defendants David B. Lichtenstein and Lyle S. Woodcock were elected to fill the vacancies. Gerard and Woodcock had been officers of American Investment Company and each had had long experience in the small loans business and were part of the management being provided by Lichtenstein to Liberty. These resignations and elections occurred prior to any other business considered at the meeting, except the amendments of by-laws and the election of I. H. Levy as chairman of the board.

16. At the same meeting both Gerard and Woodcock were elected as Vice Presidents and Lichtenstein was elected President of Liberty. Also, the office of Chairman of the Board was created, and I. H. Levy was elected Chairman to serve until the next annual meeting of directors. His compensation was fixed at an annual rate of $40,000 to commence August 1, 1954. At the same meeting his resignation as President was accepted and his salary for that office, which had been $65,300 for 1953, terminated.

17. At the same meeting of July 20, 1954, the Employees' Stock Purchase Plan was unanimously adopted by the directors. It provided for the issuance of up to 115,000 shares of Class A common stock, under an installment payment program providing for payments over a period of not exceeding five years, to officers and employees (or members of their families or family trusts) determined by the directors to be key employees in carrying out the future expansion and growth of Liberty.

18. The shares issued under said Plan were party paid and assessable shares, although the purchaser, upon issuance, was vested with full and complete title. Such shares carried the right to vote the same as fully paid shares but were restricted as to dividends so as to receive only the proportionate part of dividends declared and paid in proportion to the amount paid in on the shares. Rights of such shares upon liquidation were similarly restricted. The Plan provided for payments as follows: an aggregate amount equal to $1 for each share purchased payable at the date of purchase; an aggregate amount equal to $1 for each share purchased due one year after purchase; an aggregate amount equal to $1.50 for each share purchased due two years after purchase; a like amount due three years after purchase; an aggregate amount equal to $2 for each share purchased due four years after purchase; and a final installment

in the aggregate amount equal to the balance remaining unpaid with respect to all shares purchased due five years after date of purchase.

19. The Plan also provided that no shares could be assigned or transferred except by operation of law until after the lapse of the period of thirty days from and after the time the shares purchased had become fully paid and non-assessable shares. The first payment made by any purchaser was to be applied ratably toward the purchase price of all of the shares purchased; subsequent payments were to be applied upon and towards the full payment of the purchase price of as many of the shares being purchased under the Plan as such payments should suffice so that the largest number of partially paid shares should become fully paid or as nearly fully paid as possible by each such payment.

20. No purchaser could anticipate any one or more of the installments or make payments in excess of the aggregate amount of each thereof until Liberty, for a period of six consecutive calendar months, should have had consolidated net income, as defined in the Plan, equal to 90¢ per share (which would reasonably insure the continuation of payment of the pre-existing annual dividend on the Class A common stock of $1.50) on all fully paid Class A common stock and Class B common stock and on all partly paid and assessable shares which were to become fully paid by reason of the excess or advance payment, and a proportionate amount on all partially paid Class A common stock which was not to become fully paid by reason of the excess or advance payment.

21. Both the Plan itself and the resolution of the board of directors adopting same provided that the Plan should be submitted to the stockholders at either a special meeting or at the next annual meeting thereof and that the Plan should terminate and be rescinded unless approved and authorized at such meeting by the holders of a majority of each class of the then outstanding stock.

22. The Employees' Stock Purchase Plan was adopted by the board of directors for the purpose of attracting and keeping new management for Liberty and, more specifically, the new management headed by defendant Lichtenstein; to encourage executives and other employees to obtain an investment interest in the enterprise; and to secure greater incentives for outstanding services to the corporation.

23. Initially, the board of directors authorized the issuance of 93,600 shares of Class A common stock under the Employees' Stock Purchase Plan, which shares were issued on July 20, 1954, to officers and to certain key employees, some of whom were proposed by I. H. Levy and the remainder by Lichtenstein. Of these shares, Lichtenstein and members of his family or trusts of which they were beneficiaries, were allotted and purchased an aggregate of 68,000 shares, Woodcock was allotted and purchased 9,500 shares, and Gerard was allotted and purchased 9,500 shares, all of which information was set forth in the proxy statement of September 21, 1954, plaintiff's Exhibit three (3) herein.

24. No shares have been issued under the Employees' Stock Purchase Plan other than the 93,600 shares hereinabove referred to, which were issued at the total price of $17 per share payable as described in finding No. 18. This price for these restricted shares was reasonably related to the market value of fully paid and unrestricted shares of Class A common stock for the period from June 1 to and including July 20, 1954, that the bid price on July 20, 1954 was 20½ and the asked price on said date was $21¾, during which period from June 1 to July 20 the bid quotations ranged from 18½ to 20 and the ask quotations ranged from 19¾ to 21¾. It was also reasonably related to the book value of the fully paid and unrestricted Class A common stock which, as stated in the proxy statement of September 21, 1954, was $16.45 at June 30, 1954. The remaining 21,400 shares can be issued only at such price or prices

as the board of directors of Liberty may determine, but not less than $17 per share.

25. No proof was adduced by plaintiff that the action of the board of directors of Liberty in adopting said Employees' Stock Purchase Plan, in recommending the same to stockholders, in allocating shares thereunder and in fixing the price for such shares, was not in good faith or was in any way fraudulent or unfair.

26. At the July 20, 1954, meeting a possible merger of Metropolitan Loan & Investment Company and Metro Finance Co. with and into Liberty was discussed and Lichtenstein, as President, was authorized to enter into agreements with said companies looking toward such merger. The first discussions that Lichtenstein had had with any representatives of either Metropolitan or Metro concerning a possible merger with and into Liberty occurred on July 11, 1954. A formal Plan and Agreement of Merger was entered into between the three companies involved, dated as of September 1, 1954, to be deemed an agreement only upon, among other things, due adoption thereof by the stockholders of the three companies. A copy thereof was submitted to the stockholders with the proxy statement of September 21, 1954. On September 1, 1954 the directors of Liberty approved this Plan and Agreement of Merger (hereinafter sometimes called "Merger"), authorized its execution and the submission of the same to a vote of the stockholders.

27. No proof was adduced by the plaintiff that the action of the board of directors of Liberty in approving said Merger and recommending and submitting the same to a vote of the stockholders was not taken in good faith or was in any way fraudulent.

28. This Merger provided, among other things, for a reclassification of the 7,500 shares of Class B common stock of Liberty into 100,000 shares of common stock of the surviving corporation, being on an exchange ratio of 13⅓ shares of new common for each share of Class B, and the exchange of Class A common stock of Liberty for new common on a share for share basis, thereby leaving the surviving corporation with only one class of stock, each share having full voting power on all matters.

29. The necessity for eliminating the Class B stock with the consequent transfer of control of Liberty from that stock to all of the stockholders as a single class, in order to attract and keep and build up top flight management and key personnel, and to give to Liberty the other advantages set forth in the proxy statement flowing from such elimination, was recognized by Lichtenstein in his early discussions and later negotiations with I. H. Levy. The stockholders were advised in the proxy statement that the reclassification on the 13⅓ for one basis embodied in the proposed merger had been discussed during the negotiations for the purchase of the Class B common stock by Key Finance Company from I. H. Levy and members of his family, and that the three continuing directors (I. H. Levy, Allen E. Nix and David S. Harris) were in favor of such a program in view of the necessity of strengthening the management of Liberty, obtaining services of experienced key personnel and the advisability of eliminating the Class B common stock.

30. The Class B common stock, with its control of Liberty which was surrendered in and by the merger reclassification, was entitled to a substantially greater number of shares of the common stock of the surviving corporation per share than the Class A common stock was entitled to receive per share. The reclassification of 7,500 shares of Class B common stock into 100,000 shares of the common stock of the surviving corporation, restricted as to dividends as hereinafter found, was not fraudulent.

31. The exchange ratio, expressed both in terms of 13⅓ shares of new common for one share of Class B common stock and also in terms of 100,000 shares of new common for 7,500 shares of Class B common stock, appears and in several places in the proxy statement of Sep-

tember 21, 1954, along with complete information as to the price paid by Key Finance Company to I. H. Levy and the other sellers of the 7,241 shares of Class B common stock. The cost of the entire 7,500 shares of Class B common stock (applying the average price paid for the Levy group of shares to the remaining 259 shares) translated into the 100,000 shares of new common would amount to $17.61 per share of such new common, which figure was reasonably related to the market price and to the book value of the Class A common stock during the period preceding the purchase, being somewhat less than the market price and somewhat greater than the book value.

32. The 100,000 shares of common stock of the surviving corporation exchanged for the Class B common stock of Liberty were restricted as to dividends, receiving only 7½% of the dividends declared and payable on the other shares of such common stock until for a period of six months the consolidated net income of Liberty (as the surviving corporation) and its subsidiaries, as defined and set out in the proxy statement, should have been not less than 90¢ per share on all fully paid shares of common stock outstanding at the end of the period, including the 100,000 shares of stock so restricted, plus a proportionate amount applicable to the partially paid and assessable shares of common stock outstanding at the end of the period. The shares of new common stock issued to the holders of the Class A common stock of Liberty and to the stockholders of Metropolitan and Metro were not so restricted.

33. The proxy statement sets forth correctly on a pro forma basis and upon the assumptions therein stated the effect that such reclassification would have upon the book value of the Class A and the Class B common stocks expressed in dollar figures per share, and the proxy statement also sets forth correctly the effect the reclassification would have on the earnings available for dividends on each class, again expressed in dollar figures per share.

34. There are no misrepresentations of any kind in the proxy statement of September 21, 1954, and there was no omission of any material fact. Full information as to both the Employees' Stock Purchase Plan and the proposed Merger, including the reclassification of the 7,500 shares of Class B common stock of Liberty into 100,000 shares of common stock of the surviving corporation, was presented, in clear and understandable manner, in said proxy statement, which was sent to all stockholders of record on September 21, 1954, together with a formal notice of the stockholders' meeting to be held November 3, 1954, to vote on both of such matters.

35. On November 3, 1954, the stockholders of Liberty voted in favor of both the Employees' Stock Purchase Plan and also the Plan and Agreement of Merger. 382,740 shares of Class A common stock present in person or by proxy, being 86.2% of the Class A common stock (excluding stock sold pursuant to the Employees' Stock Purchase Plan which did not vote on the proposition) and 98.8% of the Class B common stock voted to approve and authorize the Employees' Stock Purchase Plan. Only 3.5% of the Class A common stock and none of the Class B common stock was voted against the approval and authorization of said Plan. 486,938 shares of Class A common stock, including 93,000 shares sold pursuant to the Employees' Stock Purchase Plan, and 7,409 shares of the Class B common stock, being 90.7% of all the shares entitled to vote, voted in favor of the Merger (which included the reclassification of the Class B stock into 100,000 shares of the new common stock). Less than 1% of all the shares entitled to vote were voted against the Merger.

36. The entry of the new management into Liberty, the Employees' Stock Purchase Plan and the proposed Merger, including the reclassification of the Class B common stock of Liberty into a single class, together with the ratio of reclassification of that stock, was widely publicized by newspaper releases, in the Wall

Street Journal, and in various financial publications, such as Dow Jones, Moody's Banks & Finance, and Standard & Poor's. The full details of both proposals were set forth extensively in the Moody's publication dated September 11, 1954, following an earlier summary thereof dated July 24, 1954, and in Standard & Poor's Standard Corp. Records, "Daily News Section" of September 13, 1954.

37.    As stated in the Proxy Statement of September 21, 1954, a group of securities dealers was formed by Riter & Co., Edward D. Jones & Co. and Fairman Harris and Company, Inc. for the purpose of soliciting from stockholders of the corporation proxies in favor of the Merger.   No decision to organize and use a proxy soliciting group was reached and no fee or division thereof was determined until September 1, 1954.   The matter was fully discussed and authority given at the meeting of directors of Liberty on that date.   Full information as to all fees to be paid such securities dealers was set forth in the proxy statement, both as to the amount to be paid to the managing group of the dealers and the 15¢ per share payable to dealers for obtaining proxies favorable to the adoption of the Merger.   The payment of such fees was not fraudulent, unreasonable or improper.

38.    There is no evidence that the vote cast by any stockholder in favor of the Plan and Agreement of Merger was in any way affected by or the result of the payment of fees or compensation to any soliciting dealer, or that such vote was cast by any such stockholder other than as the result of the free and independent best judgment of such stockholder.   The form of proxy submitted to the stockholders provided for voting for or against both propositions and that where no specific instruction was given, the proxies would vote the shares in favor of both the Employees' Stock Purchase Plan and the Merger.   All proxies received were voted in accordance with the instructions of the stockholders.

39.    In the last year or two prior to July, 1954 the management headed by I.

H. Levy lacked depth of adequate personnel, particularly in properly trained supervisory personnel.   During such period Liberty had not progressed and was beginning to decline, both in business volume and earnings, in contrast to the trend of other companies in the industry toward continued and increased growth during such period.

40.    When Lichtenstein brought in his new management, he recognized that at least for a transition period it would be good business to retain some or all of the principal executives of the I. H. Levy management.   This was accomplished by electing I. H. Levy as chairman of the board and by retaining the services of H. H. Levy and Louis Strilky under term contracts requiring them to continue to do essentially the same duties which they had previously performed.

41.    The salaries of I. H. Levy, H. H. Levy and Louis Strilky were substantially reduced.   The aggregate reductions enabled Liberty to pay the salaries of the new top management personnel brought in by Lichtenstein without increasing the overhead for executive salaries.

42.    The employment arrangements covering the services of I. H. Levy, H. H. Levy, and Louis Strilky, were bona fide arrangements entered into for the purpose of securing actual services to be rendered by them and each of them to Liberty Loan Corporation and for the purpose of preventing them from rendering services to competitors of Liberty. The compensation paid to I. H. Levy, H. H. Levy, and Louis Strilky and each of them was compensation for services actually rendered by them and each of them and was not part of the purchase price of Class B shares sold to Key Finance Company by I. H. Levy and his associates. I. H. Levy has at all times rendered and is still rendering substantial personal services as Chairman of the Board of Liberty Loan Corporation.   H. H. Levy and Louis Strilky rendered substantial personal services pursuant to their contracts of employment until the respective dates upon which their contracts of employment were terminated.

43. During the period from July 20, 1954 to and including the commencement of the trial of this action, the management headed by Lichtenstein has accomplished a considerable growth on the part of Liberty in its outstandings or accounts receivable (which are the backbone of the company's business), its lines of credit, its scope and size of operations, its earnings and its position in the industry. Also, since July 20, 1954 the market value of the Class A common stock and, since November 3, 1954, of the common stock of the surviving corporation has steadily increased, and in the first eleven days of June, 1956, it was quoted from 32 high to 31½ low on the bid side and 32½ high to 32¼ low on the asked side.

44. Specifically, during this period the outstandings or accounts receivable of Liberty increased from approximately $20,000,000 to $36,500,000, or better than 75%; its number of accounts increased during the same period about 71%; the entire industry increased during said period about 26% whereas Liberty increased about 67%. The earnings of Liberty for the first five months of 1956 have been at the rate of in excess of $100,000 per month, which was fifty per cent higher than Liberty's earnings had ever been.

45. During the same period Liberty increased its bank lines of credit, which are vital to the success and growth of finance companies, from approximately $20,000,000 to $29,000,000. Additionally, Liberty has obtained $6,500,000 of funds from insurance company loans, and at the time of trial had commitments for an additional $8,500,000 of such funds.

46. Also, during the same period, the company increased its offices from 66 to 127, and increased the scope of its business activities from seven states to fifteen at the present time. In 1954 Liberty was about thirtieth in the small loan industry, and at the time of the trial it had increased its position to substantially in the area of tenth.

47. From the evidence it does not appear that any of the defendants entered into a scheme to defraud the former Class A stockholders or Liberty, itself; nor does it appear from the evidence that any of the defendants, singly or in concert, committed any fraud against the Class A stockholders or Liberty.

Conclusions of Law.

1. This Court has jurisdiction of the parties to and the subject matter of this action.

2. Since Liberty Loan Corporation is a Delaware corporation, the issues presented in this action are governed by the law of the State of Delaware.

3. Under the Delaware law, a minority shareholder has a statutory right to object to any proposed merger of his corporation with any other corporation, and to have his stock appraised and the appraised value paid to him by the surviving corporation.

4. Under the law of the State of Delaware where, as here, both the Employees' Stock Purchase Plan and the Plan and Agreement of Merger have received the favorable vote of more than two-thirds of the stockholders, such Employees' Stock Purchase Plan and such Plan and Agreement of Merger are presumed to be fair and cannot be successfully attacked by dissident stockholders except upon a showing of actual or constructive fraud.

5. Neither the Employees' Stock Purchase Plan nor the Plan and Agreement of Merger, nor any of the terms and provisions of either, nor any action by any of the defendants herein as shown by the evidence herein constituted actual fraud or amounted to constructive fraud.

6. Although the Employees' Stock Purchase Plan was by the Board of Directors of Liberty submitted to the stockholders for termination or rescission, under the law of the State of Delaware the board of directors of Liberty had power and authority to adopt the Employees' Stock Purchase Plan and to issue shares thereunder and to fix the

consideration to be received therefor without submitting the matter to a vote of the stockholders.

7. The plaintiff has failed to establish by the evidence adduced that she or the Class A stockholders whom she represented or Liberty was entitled to any relief against any of the defendants.

8. The equities of this action are with the defendants and against the plaintiff.